**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| **JASON T. ROOZEMOND** | * | |
| 5129 Sunscape Lane, South | | |
| Fort Worth, TX  76123, | * | |
| Individually and on Behalf of All Others | | |
| Similarly Situated, | * | |
| | | |
| Plaintiff, | * | |
| | | |
| vs. | * | |
| | | |
| **KNORR-BREMSE AG** | * | |
| Moosacher Street 80 | | |
| 80809 Munich, Germany, | * | |
| | | |
| | * | CASE NO: _____ |
| **KNORR BRAKE COMPANY LLC,** | | |
| 1 Arthur Peck Drive | * | |
| Westminster, MD  21157, | | |
| | * | |
| **NEW YORK AIR BRAKE LLC,** | | |
| 748 Starbuck Avenue | * | |
| Watertown, NY  13601, | | |
| | * | |
| **BENDIX COMMERCIAL VEHICLE** | | |
| **SYSTEMS LLC,** | * | |
| 901 Cleveland Street | | |
| Elyria, OH  44035, | * | |
| | | |
| **WESTINGHOUSE AIR BRAKE** | * | |
| **TECHNOLOGIES CORPORATION,** | | |
| 1001 Air Brake Avenue | * | |
| Wilmerding, PA  15148, | | |
| | * | |
| **WABTEC RAILWAY ELECTRONICS,** | | |
| **INC.,** | * | |
| 21200 Dorsey Mill Road | | |
| Germantown, MD  20876, | * | |
| | | |
| **FAIVELEY TRANSPORT S.A.,** | * | |
| 3, Rue du 19 Mars 1962 | | |
| 92230 Gennevilliers, France, | * | |

**FAIVELEY TRANSPORT NORTH**     \*
**AMERICA, INC.,**
1001 Airbrake Avenue     \*
Wilmerding, PA  15148,
    \*

**RAILROAD CONTROLS, L.P.,**     \*
9800 Hillwood Parkway, Suite 340
Fort Worth, TX  76177,     \*

**XORAIL, INC.**     \*
1001 Airbrake Avenue
Wilmerding, PA  15148     \*

–and –     \*

**DOES 1-20,** inclusive,     \*

    Defendants.     \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT
## AND
## JURY TRIAL DEMAND

Plaintiff Jason T. Roozemond brings this class action, individually and on behalf of all others similarly situated, for claims under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, to recover damages and obtain injunctive relief for injuries caused by defendants Knorr-Bremse AG ("Knorr"), Knorr Brake Company LLC ("Knorr Brake"), New York Air Brake LLC ("N.Y. Air Brake"), Bendix Commercial Vehicle Systems LLC, Westinghouse Air Brake Technologies Corporation ("Wabtec"), Wabtec Railway Electronics, Inc., Faiveley Transport S.A., Faiveley Transport North America, Inc. ("Faiveley North America"), Railroad Controls, L.P. and Xorail, Inc. (together "defendants").  The allegations herein are based on plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by counsel.

## NATURE OF THE ACTION

1.     Plaintiff's claims stem from a conspiracy to enter a series of unlawful agreements among defendants, the world's largest rail equipment suppliers and their related subsidiaries, to restrain competition in the labor markets in which they compete for employees.  Defendants are each other's top competitors for rail equipment used in freight and passenger rail applications.  They also compete with each other to attract, hire and retain various skilled employees, including rail industry project managers, engineers, sales executives, business unit heads and corporate officers.  Prior to its acquisition by Wabtec in November 2016, Faiveley Transport S.A. ("Faiveley") also competed with Knorr and Wabtec to attract, hire, and retain employees.

2.     Without the knowledge or consent of their employees, defendants and senior executives at these supposed competitors entered into express agreements to eliminate or reduce competition among them for skilled labor.  The conspiracy consists of at least three agreements among the defendants – one between Knorr Brake and Wabtec, one between Knorr Brake and Faiveley North America and a third between Wabtec and Faiveley North America – that each company would refrain from hiring or attempting to hire employees from the other company without prior consent from that company.

3.     The conspiracy suppresses employee compensation and imposes unlawful restrictions on employee mobility.  Defendants are the largest rail equipment suppliers in the world and are often in direct competition with one another.  Employees at these companies possess skills that are particularly valuable.

4.     The unlawful agreements between defendants included promises and commitments not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, "no-poach agreements").  The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.  They

spanned several years, were monitored and enforced by high-level company executives, and had the effect of unlawfully allocating employees between the companies, resulting in harm to U.S. workers and consumers.

5.    Beginning no later than 2009, senior executives of defendants, including executives at several U.S. subsidiaries, entered into various no-poach agreements as detailed more extensively below.

6.    These *per se* unlawful restraints of trade violate §1 of the Sherman Antitrust Act, 15 U.S.C. §1.

7.    Defendants' wrongdoing came to light through an investigation by the U.S. Department of Justice ("DOJ") into the Wabtec-Faiveley merger.  On April 3, 2018, the DOJ filed a complaint (the "DOJ Complaint") and simultaneously announced a settlement with defendants Knorr and Wabtec. The settlement does not include any monetary relief.

## PARTIES

### Plaintiff

8.    Plaintiff Jason T. Roozemond is a citizen and resident of the State of Texas. Plaintiff was employed by defendant Xorail, Inc., a wholly-owned subsidiary of defendant Wabtec during the relevant period.  Plaintiff was injured in his business or property by reason of the violations alleged in this complaint.

### Defendants

9.    Defendant Knorr-Bremse AG is a privately owned German company with its headquarters in Munich, Germany.  Knorr is a global leader in the development, manufacture and sale of rail and commercial vehicle equipment.   In 2017, Knorr had annual revenues of approximately $7.7 billion.  Knorr has several wholly-owned subsidiaries in the United States.

10.     Defendant Knorr Brake Company LLC is a Delaware corporation with its headquarters in Westminster, Maryland.  Knorr Brake manufactures train control, braking and door equipment used on passenger rail vehicles.  Knorr Brake is a wholly-owned subsidiary of Knorr.

11.     Defendant New York Air Brake LLC is a Delaware corporation with its headquarters in Watertown, New York.  N.Y. Air Brake manufactures railway air brakes and other rail equipment used on freight trains. N.Y. Air Brake is a wholly-owned subsidiary of Knorr.

12.     Defendant Bendix Commercial Vehicle Systems LLC ("Bendix") is a Delaware company with its principal place of business located at 901 Cleveland Street, Elyria, Ohio 44035. Bendix develops and supplies active safety technologies, air brake charging and control systems, and components for medium- and heavy-duty trucks, tractors, trailers, buses and other commercial vehicles.  It is a wholly-owned subsidiary of Knorr.

13.     Defendant Westinghouse Air Brake Technologies Corporation is a Delaware corporation headquartered in Wilmerding, Pennsylvania.  With over 100 subsidiaries, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail industry.  Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures and sells rail equipment and services for passenger rail applications.  It is based in Spartanburg, South Carolina.  Wabtec Global Services is a business unit of Wabtec that offers maintenance, repair and support services. It has several locations throughout the United States.

14.     Defendant Wabtec Railway Electronics, Inc. ("Wabtec Railway") is wholly owned subsidiary of Wabtec and a Delaware corporation with its principal place of business located at

21200 Dorsey Mill Road, Germantown, Maryland 20876.  It designs, develops, manufactures and repairs electronic products used to improve railroad operations and safety.

15.    Defendant Faiveley Transport S.A. had been a French société anonyme based in Gennevilliers, France.  On November 30, 2016, Wabtec acquired Faiveley, making Faiveley a wholly-owned subsidiary of Wabtec.  Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr.  Faiveley had employees in 24 countries, including at six U.S. locations.  It developed, manufactured and sold passenger and freight rail equipment to customers in Europe, Asia and North America, including in the United States, with revenues of approximately €1.2 billion in 2016.

16.    Defendant Faiveley North America was a wholly-owned subsidiary of Faiveley and a New York corporation headquartered in Greenville, South Carolina.  In the United States, Faiveley conducted business primarily through Faiveley North America.  Certain Faiveley and Faiveley North America recruiting activities conducted prior to the acquisition by Wabtec are at issue in this complaint.

17.    Defendant Railroad Controls, L.P. is a Texas company with its principal place of business located at 9800 Hillwood Parkway, Suite 340, Fort Worth, Texas 76177.  It is one of the largest railroad signal construction companies in the United States and a wholly-owned subsidiary of Wabtec.

18.    Defendant Xorail, Inc. is a Florida corporation with its headquarters in Pennsylvania.  Xorail is a provider of signal, communications and positive train control engineering, and design, systems integrator, configuration management and construction services for the rail industry.  Xorail is a wholly-owned subsidiary of Wabtec.

**Unnamed Co-Conspirators**

19.    Plaintiff alleges on information and belief that Does 1-20, inclusive, were co-conspirators with other defendants in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.  Does 1-20 are predecessors, successors, subsidiaries, corporate officers, members of the boards of directors or senior officials of defendants.  Plaintiff is presently unaware of the true names and identities of those defendants sued herein as Does 1-20.  Plaintiff will amend this complaint to allege the true names of the Doe defendants when he is able to ascertain them.

**JURISDICTION AND VENUE**

20.    Plaintiff brings this action under §§4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover damages suffered by plaintiff and the Class and to secure equitable and injunctive relief against defendants for violating §§1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§1 and 3).  Plaintiff and the Class also seek attorneys' fees, costs and other expenses under federal law.

21.    This Court has jurisdiction over the subject matter of this action pursuant to §16 of the Clayton Act (15 U.S.C. §26), §§1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§1 and 3) and 28 U.S. §§1331 and 1337.

22.    Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391(b), (c) and (d), because a substantial part of the events giving rise to plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the defendants reside, are doing business in, or transact business in this District.

23.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the State of Maryland, including contacts in furtherance of the conspiracy alleged herein

## NATURE OF THE INDUSTRY

24.     Defendants are among the world's largest rail equipment suppliers and are rivals in the development, manufacture and sale of equipment used in passenger and freight rail applications.

25.     Defendants compete with one another and with firms in the rail industry to attract, hire and retain skilled employees.  There is a high demand for (and a limited supply of) skilled employees who have experience in the rail industry.

26.     Many of the jobs in the industry require advanced degrees, including in engineering or other technical fields.  Some positions require knowledge of specialized tools and systems unique to the rail industry.  Positions in the rail industry may also require computer programming skills and knowledge of programing languages.  Management positions require significant business experience in addition to specialized skills and knowledge.

27.     Defendants produce systems for braking and control of freight and passenger rail applications.  These complex systems must comply with a multitude of regulations and are required to undergo rigorous testing.  Certain employees must have an understanding of these specialized systems and testing needs and must be able to carry out and understand such testing.

28.     Because of the high degree of specialized skill involved in this industry, defendants generally prefer to hire people who have prior experience in the rail industry, rather than recruiting more broadly.

29.     According to data from the Bureau of Labor Statistics, as of May 2018 there were about 212,300 jobs in the sector.  According to 2017 figures, there were 34,070 locomotive

engineers, 13,310 rail car repairers, 7,690 rail-track laying and maintenance equipment operators, 11,820 railroad brake, signal and switch operators, and 39,590 railroad conductors and yardmasters. For these professions, the median wage in 2017 ranged from $54,820-$61,380.[1]

30.    Defendants employ thousands of workers. Wabtec is reported to employ more than 18,000 employees world-wide and acquired about 5,700 workers in 24 countries with the acquisition of Faiveley.[2] Knorr reports that it employs about 24,565 employees worldwide.[3]

## GOVERNMENTAL INVESTIGATIONS

### The Government Has Increased Scrutiny of Anticompetitive Employment Agreements

31.    In October 2016, the DOJ's Antitrust Division and the Federal Trade Commission issued *Antitrust Guidance for Human Resource Professionals* (the "Guidance"). The Guidance, "among other things, announced that no-poach and wage-fixing agreements will generally be treated as criminal antitrust offenses going forward."[4]

32.    The Guidance states that"[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal

---

[1]    Bureau of Labor Statistics, *Industries at a Glance – Rail Transportation: NAICS 482*, https://www.bls.gov/iag/tgs/iag482.htm (last visited June 5, 2018).

[2]    Wabtec Corp., *Fast Facts*, https://www.wabtec.com/fast-facts (last visited June 5, 2018); Faiveley Transport, *Faiveley Transport and Wabtec Corporation Signed a Definitive Agreement to Create a Global Leading Player in Railway Equipment*, Oct. 6, 2015, http://www.faiveleytransport.com/news/faiveley-transport-and-wabtec-corporation-sign-definitive-agreement-create-global-leading-playe.

[3]    Statista, *Employment Figures of Knorr-Bremse from 2011-2017*, https://www.statista.com/statistics/665505/knorr-bremse-employment-figures/ (last visited June 5, 2018).

[4]    Juan Arteaga and Richard Stella, *DOJ Brings First 'No-Poach' Prosecution Since Issuing Antitrust Guidance for HR Professionals*, N.Y. Law J. (Apr. 11, 2018), https://www.law.com/newyorklawjournal/2018/04/11/doj-brings-first-no-poach-prosecution-since-issuing-antitrust-guidance-for-hr-professionals/.

under the antitrust laws.  That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects."[5]

33.    According to the *New York Law Journal*, in January 2018, the new head of the Antitrust Division – Assistant Attorney General Makan Delrahim – publicly stated that the Division has several ongoing no-poach investigations and would soon be bringing enforcement actions in these investigations: "'In the coming couple of months, you will see some announcements, and to be honest with you, I've been shocked about how many of these [no-poach agreements] there are, but they're real.'"  This warning followed public remarks by the Antitrust Division's second-in-command – Principal Deputy Assistant Attorney General Andrew Finch – late last year indicating that companies and their executives "'should be on notice' that they could be criminally prosecuted for participating in no-poach or wage-fixing agreements regardless of whether they compete to sell the same products or services."[6]

34.    The action taken by the DOJ as to defendants was the first following the issuance of the Guidance.

### Investigation of Defendants and Revelation of the Scheme

35.    The DOJ Complaint reveals a years-long conspiracy by defendants likely affecting many thousands of workers.

---

[5]    *See* Department of Justice, Antitrust Division, *Antitrust Guidance for Human Resource Professionals*, Oct. 2016, https://www.justice.gov/atr/file/90351 l/download.

[6]    Juan Arteaga and Richard Stella, *DOJ Brings First 'No-Poach' Prosecution Since Issuing Antitrust Guidance for HR Professionals*, N.Y. Law J. (Apr. 11, 2018), https://www.law.com/newyorklawjournal/2018/04/11/doj-brings-first-no-poach-prosecution-since-issuing-antitrust-guidance-for-hr-professionals/.

36.     Knorr and Wabtec (which now includes Faiveley) are the world's largest rail equipment suppliers and each other's top rival for the development, manufacture and sale of equipment used in freight and passenger rail applications.  In addition, there is competition to attract, hire and retain skilled employees.

37.     There is a significant demand for these skilled employees and as a result, firms in the rail industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training and experience for a job opening.  Employees of other rail industry participants, including the employees of Knorr's and Wabtec's customers, competitors and suppliers, are key sources of potential talent to fill these openings.[7]

38.     According to the Competitive Impact Statement, firms in the rail industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit and otherwise help hire potential employees.  These companies also receive direct applications from individuals interested in potential employment opportunities.  Directly soliciting employees from another rail industry participant is a particularly efficient and effective method of competing for qualified employees.  Soliciting involves communicating directly – whether by phone, e-mail, social and electronic networking, or in person – with another firm's employee who has not otherwise applied for a job opening.

39.     Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary for the vacant position and may be unresponsive to other methods of recruiting.  The DOJ Complaint alleges that the rail

---

[7]    *See* Competitive Impact Statement, *USA v. Knorr-Bremse AG, et al.*, No. 18-cv-00747 (D.D.C. Apr. 3, 2018).

industry is an insular one where employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

40.     In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract highly skilled talent for their employment needs, so-called lateral hiring.  This competition benefits employees because it increases the available job opportunities that employees learn about.  It also improves an employee's ability to negotiate for a better salary and other terms of employment.

### THE NO-POACH AGREEMENTS

### Wabtec-Knorr Agreements

41.     Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions.  Senior executives at the companies' global headquarters as well as their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees.  The no-poach agreements primarily affected recruiting for project management, engineering, sales and corporate officer roles and restricted each company from soliciting current employees from the other company.  At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.  Beginning no later than 2009, Wabtec's and Knorr Brake's most senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications.

42.     In a letter dated January 28, 2009, a director of Knorr Brake wrote to a senior executive at Wabtec's headquarters, stating: "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies.  As you so accurately put it, 'we compete in the market.'"  As alleged in the DOJ Complaint, that agreement was well known

to senior executives at the parent companies, including top Knorr executives in Germany who were included in key communications about the no-poach agreement.

43.     In furtherance of their agreement, Wabtec and Knorr Brake informed their outside recruiters not to solicit employees from the other company. In some instances, Wabtec and Knorr Brake's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by the other company without prior approval of the other firm. Knorr and Wabtec's no-poach agreements also extended to the companies' U.S. freight rail businesses. According to the DOJ Complaint, Knorr's and Wabtec's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements.

44.     In some instances, Wabtec and Knorr Brake's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr Brake stated that he would not even consider a Wabtec candidate who applied to Knorr Brake without the permission of his counterpart at Wabtec.

45.     Wabtec and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses. In July 2012, for example, a senior executive at N.Y. Air Brake informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

46.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who allegedly

solicited a Knorr Brake employee for an opening at Wabtec.  The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**Knorr-Faiveley Agreement**

47.    Beginning no later than 2011, senior executives at Knorr Brake and Faiveley North America reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company.  The DOJ Complaint alleges that in October 2011, a senior executive at Knorr Brake explained in an e-mail to a high-level executive at Knorr that he had a discussion with an executive at Faiveley's U.S. subsidiary that "'resulted in an agreement between us that we do not poach each other's employees.  We agreed to talk if there was one trying to get a job[.]'"  Executives at Knorr Brake and Faiveley's U.S. subsidiary actively managed the no-poach agreement with each other through direct communications.

48.    The DOJ Complaint specifically alleges that in or about 2012, a senior executive at Knorr Brake discussed the companies' no-poach agreement with an executive at Faiveley North America.  This discussion took place at a trade show in Berlin, Germany.  Subsequently, the executives enforced the no-poach agreement with each other through direct communications.

49.    This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure adherence to the agreement.  For example, in October

2012, executives at Faiveley North America stated in an internal communication that they were required to contact Knorr Brake before hiring a U.S. train brake engineer.

50.    The companies continued their no-poach agreement until at least 2015.   After Wabtec announced its proposed acquisition of Faiveley in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other jurisdictions to raid Faiveley for high-potential employees.

### Wabtec-Faiveley Agreement

51.    Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.   According to the DOJ Complaint, Wabtec Passenger Transit and Faiveley North America executives actively managed and enforced their agreement with each other through direct communications.   The DOJ Complaint specifically alleges that in an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that a candidate "'is a good guy, but I don't want to violate my own agreement with [Faiveley North America].'"   Only after receiving permission from Faiveley North America did Wabtec Passenger Transit hire the project manager. One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley North America's employees was "'off the table'" due to the agreement with Faiveley North America not to engage in hiring discussions with each other's employees without the other's prior approval.

52.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016.  Faiveley is now a wholly-owned subsidiary of Wabtec.

53.    The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

**EFFECTS OF THE SCHEME ON COMPETITION AND ANTITRUST
INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS**

54.     Defendants' conspiracy was intended to and did suppress compensation for plaintiff and the Class (as defined below) and restricted competition in the labor market in which plaintiff and the other Class members sold their services.  It did so through a scheme that eliminated solicitation, a significant form of competition to attract skilled labor in the U.S. rail industry.

55.     Solicitation has a significant beneficial impact for individual employee's compensation.  Specifically, solicitation from rival employers may include offers that exceed an employee's salary, allowing them to receive a higher salary by either changing employers or negotiating increased compensation from the current employer.  Employees solicited from other industry players may also inform other employees of the offer they receive, spreading information about higher salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

56.     As the government notes, active solicitation similarly affects compensation practices by employers.  A firm that solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive.  Similarly, through solicitation, companies would be privy to information indicating whether their offered compensation is enough to keep their current employees and may cause employers to preemptively increase their employees' compensation in order to reduce their competitors' appeal.  Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation.  Restraining active recruitment made higher paying opportunities less transparent to workers and thus allowed employers to keep salaries artificially suppressed.

57.    Defendants' conspiracy was an ideal tool to suppress their employees' compensation.    Agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all employees in a common and predictable fashion) was simple to implement and easy to enforce.

## EFFECTS ON INTERSTATE COMMERCE

58.    During the relevant period, defendants and their co-conspirators employed members of the proposed Class throughout the United States, including in this District.

59.    Conduct by defendants and their co-conspirators has substantially affected interstate commerce in the United States and has caused antitrust injury throughout the United States.

60.    This anticompetitive behavior did not just affect particular individuals who would have been solicited, but all workers and Class members employed by the defendants.    Labor competition in the rail and freight industry is nationwide.    Defendants considered each other's compensation packages to be competitively relevant regardless of location, and many Class members may have moved between states to pursue employment opportunities.

61.    Therefore, defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust industry throughout the United States.

## CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3).    The proposed Class is defined as follows:

> All natural persons employed by the defendants or their wholly-owned subsidiaries
> in the United States, at any time from the start of the conspiracy (no later than 2009)
> to the present.    Excluded from the Class are senior executives and personnel in the

human resources, recruiting or legal departments of the defendants as well as employees hired by defendants outside of the United States to work outside the United States.

63.     The exact size of the proposed class is unknown at this time, but is believed to be many hundreds, if not thousands, based on data from the Bureau of Labor Statistics.  The exact number of Class members can be determined by reference to records in the custody or control of defendants.

64.     Questions of law and/or fact common to the Class include, but are not limited to:

(a)     whether the defendants violated the Sherman Antitrust Act;

(b)     Whether defendants' agreements constitute a per se violation of the Sherman Antitrust Act;

(c)     Whether defendants agreed not to solicit each other's employees;

(d)     Whether defendants exchanged competitively sensitive salary information and agreed upon compensation ranges for positions held by Class members;

(e)     The extent to which defendants' conduct suppressed competition below competitive levels;

(f)     Whether defendants fraudulently concealed their actions;

(g)     Whether defendants' agreements have restrained trade, commerce or competition for skilled labor among defendants and their co-conspirators;

(h)     Whether plaintiff and the proposed Class have suffered antitrust injury or have been threatened with injury; and

(i)     The amount of damages suffered by plaintiff and the proposed Class.

65.     These and other questions of law and fact are common to the proposed Class and predominate over any questions affecting only individual members of the proposed Class.

66.     Plaintiff's claims are typical of the claims of the proposed Class

67.     Plaintiffs will fairly and adequately represent the interests of the proposed Class and has no conflict with the interests of the proposed Class.

68.     Plaintiff has retained counsel experienced in antitrust and complex class action litigation to represent himself and the proposed Class.

69.     Defendants and their co-conspirators have acted on grounds generally applicable to the proposed Class, thereby making any final injunctive relief appropriate with respect to the proposed Class as a whole.

70.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication and resolution of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive and inconsistent litigation.  There will be no material difficulty in the management of this action as a class action.  Separate prosecution, by contrast, would create the risk of inconsistent or varying adjudications and would be inefficient and burdensome to the parties and the Court.

## PLAINTIFF'S CLAIMS ARE TIMELY

71.     Any applicable statute of limitations has been tolled by defendants' knowing and active concealment of their unlawful acts.  Plaintiff and the proposed Class did not have actual or constructive knowledge of the facts constituting their claims until April 3, 2018, when the DOJ's settlement with the defendants became public.

72.     Defendants and their co-conspirators actively concealed their anticompetitive agreement from all members of the proposed Class, including plaintiff.  During the relevant time period, Class members had no actual or constructive knowledge of the nature or existence of the conspiracy.

73.     Defendants deliberately concealed their no-poach agreements and communications about those agreements by hiding the substance of the conspiracy from public view and by affirmatively making misleading statements to the public.

74.     Knorr's 2017 Annual Report refers to Wabtec as its "principal competitor." Knorr's Code of Conduct, which applies to all of its worldwide employees, required "the entire workforce . . . to observe the law."   The Code of Conduct also states, in a section relating to antitrust laws, that Knorr is "committed to observing the regulations on fair competition.   In particular, in order to avoid infringing anti-trust legislation, it is not permitted to conclude agreements with competitors on [i] prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company, [ii] non-competition, false tendering or [iii] apportionment out of customers, markets, areas, production programs etc."

75.     Wabtec's 2017 Form 10-K identifies Knorr as a "principal competitor."   Wabtec also reported that it has a "responsibility for conducting the Company's affairs according to the highest standards," including conducting "business activities within the laws of host countries in which the Company operates."

76.     In its Annual Reports from 2009 through at least 2015, Wabtec identified N.Y. Air Brake as a "principal overall OEM competitor," as well as a competitor for "locomotive, freight and passenger transit service and repair" in North America.   From 2013 through at least 2015, Wabtec identified Knorr and Faiveley as its "largest competitors for Brake and Transit products" outside North America.

77.     The details of defendants' conspiracy have only recently come to light.   On April 3, 2018, following an investigation, the DOJ's Antitrust Division filed a civil complaint and a stipulated judgment against Knorr and Wabtec regarding the no-poach agreements.   In accordance

with the stipulated judgment, Knorr and Wabtec agreed to end participation in the no-poach agreements, to ensure compliance with the judgment, and to cooperate with the DOJ in any investigation concerning any other no-poach agreements.

78.    As a result of defendants' fraudulent concealment, the running of any statute of limitations has been tolled with respect to the claims that plaintiff and the proposed Class have as a result of defendants' anticompetitive and unlawful conduct.

## COUNT

**Violation of §§1 and 3 of the Sherman Antitrust Act,
15 U.S.C. §§1 and 3**

79.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

80.    Defendants, by and through their officers, directors, employees or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. §§1 and 3. Specifically, defendants agreed to restrict competition for Class members' services through refraining from solicitation of each other's employees, thereby fixing the compensation ranges of Class members, all with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for Class members' services.

81.    Defendants' conspiracy injured plaintiff and other Class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

82.    Defendants' conspiracy is a per se violation of §§1 and 3 of the Sherman Antitrust Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and designating plaintiff as a Class Representative and plaintiff's counsel as Class Counsel;

B.      For a judgment awarding plaintiff and the proposed Class treble damages, as well as all other available damages for their violations of the Sherman Antitrust Act, together with pre-judgment and post-judgment interest at the maximum rate allowable by law or allowed in equity;

C.      An order imposing a permanent injunction prohibiting defendants from hereafter agreeing not to solicit other companies' employees, agreeing to notify each other of offers extended to potential

hires, or agreeing not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

D.      For an order awarding plaintiff and the proposed Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.      For such other relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:  June 13, 2018                    Respectfully submitted,


                                         _ */s/ William H. Murphy III*_____
                                         William H. Murphy III  (Bar No. 30126)
                                         Nicholas A. Szokoly (Bar No. 28157)
                                         Jessica H. Meeder (Bar No. 17986)
                                         **MURPHY, FALCON & MURPHY**
                                         One South Street, 23rd Floor
                                         Baltimore, Maryland 21202
                                         Telephone: 410-951-8744
                                         410-539-6599 (fax)


                                         Patrick J. Coughlin *(application forthcoming)*
                                         David W. Mitchell *(application forthcoming)*
                                         Alexandra S. Bernay *(application forthcoming)*
                                         Carmen A. Medici *(application forthcoming)*
                                         **ROBBINS GELLER RUDMAN
                                         & DOWD LLP**
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
                                         Telephone:  619-231-1058
                                         619-231-7423 (fax)


                                         Brian J. Robbins *(application forthcoming)*
                                         George C. Aguilar *(application forthcoming)*
                                         Michael J. Nicoud *(application forthcoming)*
                                         **ROBBINS ARROYO LLP**
                                         600 B Street, Suite 1900
                                         San Diego, CA 92101
                                         Telephone: 619-525-3990
                                         619-525-3991 (fax)


                                         *Attorneys for Plaintiff and the proposed Class*